IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DARYL STEELE, ) | |
| ) | |
| Petitioner, ) | |
| ) | Case No. 06 C 0980 |
| v. ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Respondent. ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Before the Court is pro se Petitioner Daryl Steele's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. For the following reasons, the Court denies Steele's Section 2255 motion.

## BACKGROUND

### I. Procedural Background

On December 5, 2001, Steele was charged in a two-count indictment that included one count of conspiracy to commit extortion and one count of attempt to commit extortion. *See* 18 U.S.C. § 1951. At trial, the Government presented evidence that from May 1999 through December 3, 2001, Steele conspired with his co-conspirators to extort money from drug dealers through fear and under color of official right. On March 12, 2003, a jury convicted Steele on both counts of the indictment. The Court subsequently sentenced Steele to 96 months' imprisonment.

On appeal, Steele argued that the Court erred in applying USSG § 2C1.1, which governs offenses involving extortion under color of official right. Steele also argued that the Court erred

in imposing a 2-level enhancement under USSG § 2C1.1(b)(1). Last, Steele challenged his sentence based on *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004); *see also United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

The Seventh Circuit remanded Steele's case for the Court to address whether Steele's sentence would have been different had the sentencing guidelines not been viewed as mandatory. *See United States v. Paladino,* 401 F.3d 471 (7th Cir. 2005). On February 6, 2006, the Court issued a statement informing the Seventh Circuit that Steele's sentence would remain the same. On August 23, 2006, the Seventh Circuit affirmed the Court's sentencing determinations.

## II. Evidence Presented at Trial

At trial, the Government presented evidence that from May 1999 through December 3, 2001, Steele conspired with co-conspirators Darian Williams, Ernest "Newt" Butler, and Andre Patterson to extort money from drug dealers through wrongful use of fear and under color of official right. At the time of the conspiracy, Williams was employed by the Police Department of Inkster, Michigan and held the rank of Detective Sergeant. Prior to the conspiracy, Butler assisted Steele in at least two drug transactions with Rogelio Aguirre, a drug dealer in Chicago, Illinois.

### A. May 1999 Extortion

Trial evidence of the May 1999 extortion included testimony that Steele asked Butler if he could arrange a meeting with Detective Sergeant Williams, Butler's nephew. Steele then met with Williams at Butler's home in Detroit, Michigan. Steele asked Williams if he would participate in a "rip," in which Williams would conduct a mock traffic stop – while he was in uniform and on duty – and seize drug proceeds from Aguirre. The plan was that Aguirre would

2

sell narcotics to Steele while their girlfriends – Maria Garza and Caroline Ferguson – held the purchase money in their vehicle. As soon as Aguirre delivered the narcotics to Steele, Williams would conduct the mock traffic stop and seize the proceeds. Williams agreed to participate in this planned drug "rip."

Approximately a week later, the co-conspirators executed the "rip." While Steele and Aguirre exchanged drugs, Butler and Williams surveilled Garza and Ferguson who were traveling with the money. Williams, who was on duty and in a marked police car, waited for a signal from Steele to conduct the mock "traffic stop." At approximately 11:00 p.m., Steele called Williams on his mobile phone indicating that the "rip" was a "go." Williams then turned on his overhead lights and pulled over the vehicle with Garza, Ferguson, and another woman inside. At the time of the stop, Ferguson, Steele's girlfriend, was driving the vehicle. Williams asked the women to exit the vehicle and requested Ferguson's license and registration. Thereafter, Williams searched the vehicle and seized a bag containing money. Williams then asked who owned the bag and Ferguson responded that she did. As part of the sham, Williams placed Ferguson under arrest and put her in the backseat of the police car. Williams advised the women that he was taking the bag as evidence. Williams left the scene with the bag and Ferguson. After that, Williams met with Steele and Butler in Detroit. The seized bag contained approximately $350,000 to $400,000. According to Williams' trial testimony, Steele paid Williams and Butler $15,000 for their role in the extortion.

**B.     December 2001 Extortion**

Meanwhile, in September 1999, Steele alleged that Aguirre car-jacked and robbed him in Inkster, Michigan. Consequently, Steele pressed criminal charges against Aguirre. Williams

was assigned to the case and assisted Steele in filing criminal charges against Aguirre. Further, Williams obtained a warrant for Aguirre's arrest in Chicago. Thereafter, Butler contacted Aguirre and told Aguirre that Steele would drop the car-jacking case for $150,000. Aguirre said he would get back to Butler. Aguirre's attorney then contacted Butler and warned him that he would be subject to criminal charges if he ever contacted Aguirre again. Butler told Steele about his conversation with Aguirre's attorney.

During the Summer of 2000, the Chicago Police arrested Aguirre on unrelated charges. Aguirre then faced extradition to Michigan to answer to the car-jacking and armed robbery charges. Based on his prior criminal record, Aguirre was facing a possible life sentence if convicted of the Michigan charges. On November 15, 2001, Steele, Butler, Williams, and Patterson traveled to Chicago for Aguirre's extradition hearing. During the ride to Chicago, they discussed extorting money from Aguirre in return for dropping the Michigan charges.

Following the hearing, Butler approached Aguirre's girlfriend, Garza, and told her of Steele's offer to have the Michigan charges dropped for $150,000. Trial testimony indicates the plan was that Aguirre would pay $150,000 to Steele, Butler, and Williams. Steele, with the assistance of Williams, would then file an affidavit in which Steele would refuse to cooperate with the prosecution of the Michigan charges, thereby halting the extradition proceedings.

From November 15, 2001 through December 3, 2001, FBI agents recorded communications between the co-conspirators and Garza through the use of monitored conversations. FBI agents also monitored communications between the co-conspirators themselves through use of a court authorized intercept order. These monitored conversations revealed the negotiations between the co-conspirators and Garza. Ultimately, Garza, on behalf

4

of Aguirre, agreed to pay Steele and his co-conspirators $75,000 in return for having the Michigan charges against Aguirre dropped.  Prior to the exchange of money, the co-conspirators planned that they would fax to Garza or Aguirre's attorney Steele's affidavit indicating that Steele would not pursue the Michigan charges against Aguirre.  Williams would facilitate the filing of the affidavit, which would be submitted as a part of an official police report.

Thereafter, Patterson and Butler traveled to Chicago.  Williams and Steele remained in Michigan and prepared the necessary paperwork to dismiss the Michigan car-jacking charges.  Thereafter, Steele contacted Williams by phone and told him that he had visited the police station and informed Detective Anthony Abdullah that he no longer wanted to pursue the car-jacking charges.  Once Steele had spoken with Detective Abdullah, Williams faxed a copy of his report to Aguirre's attorney in Chicago.  Butler brought a signed copy of the report with him so he could personally provide Garza with a copy before exchanging money.

On December 3, 2001, Butler met Garza in the parking lot of a department store on 159th Street in Calumet City, Illinois.  FBI agents were surveilling Garza's meeting with Butler.  Garza waited to hear that the affidavit had been received before exchanging the money.  After the exchange of the $75,000, FBI agents stopped Butler's vehicle and arrested him.

Steele proceeded to trial and testified in his own defense.  He denied any involvement in the May 1999 extortion.  He further denied any involvement in the extortion of Garza and Aguirre in December 2001 explaining that he thought he was resolving his grievances against Aguirre in a legal manner.

## LEGAL STANDARD

A district court must grant a Section 2255 motion to vacate, set aside or correct a sentence if a petitioner establishes "that the district court sentenced him in violation of the Constitution or laws of the United States or that the sentence was in excess of the maximum authorized by law or is otherwise subject to collateral attack." *Hays v. United States*, 397 F.3d 564, 566-67 (7th Cir. 2005) (citations and quotations omitted). A Section 2255 motion is not a substitute for a direct criminal appeal – it is not the means by which a convicted defendant may appeal the same claims a second time. *See Coleman v. United States,* 318 F.3d 754, 760 (7th Cir. 2003). Accordingly, if a Section 2255 petitioner does not raise a claim in his direct appeal, that claim is barred from the Court's collateral review unless the petitioner can demonstrate cause for the procedural default and actual prejudice from the failure to appeal, *see Fuller v. United States,* 398 F.3d 644, 648 (7th Cir. 2005), or that enforcing the procedural default would lead to a "fundamental miscarriage of justice." *Gomez v. Jaimet,* 350 F.3d 673, 679 (7th Cir. 2003). On the other hand, because claims of ineffective assistance of counsel usually involve evidence outside the record, these claims are properly brought for the first time in a Section 2255 motion. *See Ballinger v. United States*, 379 F.3d 427, 429-30 (7th Cir. 2004) (citation omitted).

## ANALYSIS

Construing Steele's pro se Section 2255 motion liberally, *see Marshall v. Knight,* 445 F.3d 965, 969 (7th Cir. 2006), he brings three claims: (1) prosecutorial misconduct; (2) improper jury selection; and (3) ineffective assistance of counsel.

### I. Procedurally Defaulted Claims

The Court first addresses Steele's procedurally defaulted claims. Specifically, in his Section 2255 motion, Steele brings claims of prosecutorial misconduct and improper jury

selection for the first time. Because Steele did not present these claims on direct appeal to the Seventh Circuit, the Court is barred from reviewing them on collateral review unless Steele can demonstrate cause for the procedural default and actual prejudice from his failure to appeal. *See Fuller v. United States,* 398 F.3d 644, 648 (7th Cir. 2005). The Court may also collaterally review these barred claims if enforcing the procedural default would lead to a "fundamental miscarriage of justice." *See Gomez,* 350 F.3d at 679; *see also Coleman v. Thompson,* 501 U.S. 729, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). A fundamental miscarriage of justice occurs when a petitioner establishes that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier,* 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).

Here, Steele fails to explain why he did not present his prosecutorial misconduct or improper jury selection claims to the Seventh Circuit on his direct appeal, nor does he mention how he was prejudiced by his failure to appeal these claims. In addition, Steele does not make any arguments under the "fundamental miscarriage of justice" exception to procedural default, namely, that he is actually innocent. *See Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005).

Despite Steele's pro se status, he must present some argument in support of his claims. *See Mathis v. New York Life Ins. Co.,* 133 F.3d 546, 548 (7th Cir. 1997); *see also Anderson v. Hardman,* 241 F.3d 544, 545 (7th Cir. 2001) (despite litigant's pro se status, he still must make cogent arguments). Because Steele fails to argue, let alone establish, any exceptions to his procedurally defaulted claims, the Court is barred from reviewing them on collateral review.

**II.     Ineffective Assistance of Counsel**

7

On the other hand, Steele's ineffective assistance of counsel claims are properly brought for the first time in the present Section 2255 motion. *See Ballinger*, 379 F.3d at 429-30. To establish constitutionally ineffective assistance of counsel, Steele must show (1) his attorney's performance "fell below an objective standard of reasonableness," *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and (2) "but for counsel's unprofessional errors the result of the proceeding would have been different." *Id.* at 694. With respect to an attorney's performance, a "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id*. at 689 (citation and quotations omitted). Under the prejudice prong, Steele must establish prejudice by a "reasonable probability." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. If Steele fails to make a proper showing under one of the *Strickland* prongs, the Court need not consider the other. *Id.*

      **A.**     **Failure to Call Witnesses**

First, Steele argues that his trial attorney, Stanley Hill, was constitutionally ineffective for failing to call certain witnesses at trial. An attorney's decision not to call a witness at trial is a strategic opinion that is generally not subject to review. *United States v. Best*, 426 F.3d 937, 945 (7th Cir. 2005); *see also United States v. Balzano,* 916 F.2d 1273, 1294 (7th Cir. 1990) ("The Constitution does not oblige counsel to present each and every witness that is suggested to him. In fact, such tactics would be considered dilatory unless the attorney and the court believe the witness will add competent, admissible and non-cumulative testimony to the trial record."). When a petitioner claims that his trial counsel improperly failed to call witnesses, the petitioner

must make a specific, affirmative showing as to what the missing testimony would have been and establish that the witness' testimony would have produced a different result. *Patel v. United States*, 19 F.3d 1231, 1237 (7th Cir. 1994).

Here, Steele does not set forth any evidence about what potential witnesses Maria Garza, Rogelio Aguirre, and attorney John DeLeon would testify about if subpoenaed for trial, and thus any argument based on these three potential witnesses fails. *See United States v. Ashimi,* 932 F.2d 643, 650 (7th Cir. 1991) (to support ineffective assistance of counsel claim, petitioner must present testimony of a putative witness in the form of actual testimony or an affidavit); *see also United States v. Jackson,* 33 F.3d 866, 875 (7th Cir. 1994) (court rejected ineffective assistance claim based on trial counsel's failure to call witnesses because record did not indicate how witnesses would have testified at trial). In short, a "defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim." *Ashimi,* 932 F.2d at 650.

Next, Steele contends that his trial counsel was constitutionally ineffective for failing to call Caroline Ferguson, Alaina Winn, William Bogan, Eugene Butler, Daryl DeAngelo Steele, and Daryl DeNard Steele as witnesses at trial. In support of his claims regarding these witnesses, Steele attaches the affidavit of Jeffrey M. Brown – instead of signed and sworn affidavits of the potential witnesses. In any event, Brown interviewed these individuals as potential witnesses while working as a law clerk for Michael Petro, one of Steele's attorneys. In his affidavit, Brown sets forth a summary of his interviews with these potential witnesses. Steele also sets forth his own affidavit, albeit not signed or sworn under penalty of perjury, that his attorney talked to potential witnesses Ferguson, Bogan, Daryl Deangelo Steele, and Daryl

9

Denard Steele for possible use in his defense. Despite these affidavits, Steele does not point to any evidence in the record (or aver in his affidavit) that would establish that Hill failed to pursue a legitimate trial strategy by declining to call these witnesses. *See United States v. Pergler,* 233 F.3d 1005, 1010 (7th Cir. 2000); *see also Brown v. McGinnis,* 922 F.2d 425, 428 (7th Cir. 1991) ("to show prejudice, the defendant must make a comprehensive showing of what the potential witness' testimony would have been and how it would have produced a different result"). At best, Steele generally avers that this testimony would impeach his co-conspirators' trial testimony.

Meanwhile, as the *Pergler* court explained, a potential witness' testimony may hurt a defendant's case, instead of helping it. *See Pergler,* 233 F.3d at 1010. For instance, the Government contends that it informed attorney Hill that it would cross-examine Ferguson regarding a police report she filed in which she alleged that Steele had held her at gunpoint during a domestic dispute. Thereafter, Hill did not call Ferguson as a defense witness.

Moreover, as to the testimony of Eugene Butler, Daryl DeAngelo Steele, and Daryl Denard Steele, the Brown affidavit indicates that they would testify about petitioner Steele being kidnaped or car-jacked after the May 1999 "rip." The Government never questioned that this kidnaping/car-jacking occurred. In fact, Williams testified at trial that Aguirre kidnaped Steele in retaliation of the May 1999 "rip." Thus, this additional testimony would have been merely cumulative. *See Balzano,* 916 F.2d at 1294.

Finally, Steele has not established that he was prejudiced by counsel's failure to call these witnesses, namely, that the witnesses' testimony would have produced a different result at trial. *See Patel*, 19 F.3d at 1237. "In weighing the effect of counsel's errors, the court must

10

consider the totality of the evidence.... [A] verdict or conclusion that is overwhelmingly supported by the record is less likely to have been affected by errors than one that is only weakly supported by the record." *Eckstein v. Kingston*, 460 F.3d 844, 848 (7th Cir. 2006) (citation omitted).

Given the overwhelming trial evidence supporting Steele's guilt weighed against the value of the proposed testimony, the Court would be hard-pressed to conclude that the result of the jury trial would have been different had these witnesses testified. *See Taylor v. Bradley,* 448 F.3d 942, 950 (7th Cir. 2006). For example, Williams testified that in 1999 Steele asked Butler if he could arrange a meeting with Williams at which Steele asked Williams if he would participate in a mock traffic stop to seize drug proceeds from Aguirre, also known as a "rip." About a week later, the co-conspirators executed the "rip" in which Steele and Aguirre exchanged drugs. Williams further testified that Steele called him on his mobile phone indicating that the "rip" was a "go." Also, Williams testified that he then turned on his overhead lights and pulled over the vehicle with Garza, Ferguson, and another woman inside, searched the vehicle, and seized a bag containing money. Williams left the scene and met with Steele and Butler in Detroit with the seized bag containing approximately $350,000 to $400,000. Steele paid Williams and Butler $15,000 for their role in this extortion. In addition, Butler's trial testimony corroborates Williams' testimony.

As to the later extortion, Williams' and Butler's trial testimony reveals that Steele wanted $150,000 from Aguirre and then Steele would drop the Michigan car-jacking charges against Aguirre. Testimony further reveals that while Steele, Butler, Williams, and Patterson traveled to Chicago for Aguirre's extradition hearing, they discussed extorting money from Aguirre in

return for dropping the Michigan charges Steele filed against Aguirre. To that end, Williams and Steele prepared the necessary paperwork to dismiss the Michigan car-jacking charges, while Butler and Patterson met with Aguirre's girlfriend, Maria Garza, in Chicago to exchange $75,000. Taped telephone conversations that were played at trial revealed the co-conspirators' negotiations with Garza.

Other witnesses who testified at trial included the FBI agent who gathered the taped telephone conversations; the assistant prosecutor in Wayne County, Michigan, who handled Aguirre's extradition proceedings; an Inkster, Michigan police detective, Anthony Abdullah; the FBI agents who surveilled Butler giving Garza $75,000; and a Cook County, Illinois State's Attorney, who explained the Aguirre extradition proceedings.

Because of the overwhelming trial evidence supporting Steele's guilt, Steele has not established that the result of the jury trial would have been different had the potential witnesses testified at trial. *See Taylor*, 448 F.3d at 950. Accordingly, Steele has failed to establish that his counsel's alleged deficient performance prejudiced him as required under *Strickland*.

    **B.    Failure to Maintain and Present Evidence**

Steele also contends that his trial counsel lost taped telephone conversations that would have benefitted him at trial. Again, Steele must make a "specific, affirmative showing as to what the missing evidence would have been" before he can establish that trial counsel was ineffective for failing to present the taped telephone conversations. *See Patel,* 19 F.3d at 1237. Not only does Steele fail to articulate the subject matter of these tapes, he fails to explain how these tapes would have benefitted him at trial except that the tapes would have been used "to impeach

12

damaging testimony against me."[1] (Steele Aff. ¶ 4g.) To establish prejudice, Steele must make a comprehensive showing of what the missing evidence would have been and how it would have produced a different result, *see Brown,* 922 F.2d at 428, which Steele has failed to do. In sum, Steele has not established that trial counsel's failure to maintain or present the taped conversations at trial did not fall within the wide range of reasonable professional assistance. *See Strickland,* 466 U.S. at 688-89. Because Steele has not establish that his counsel's performance was constitutionally ineffective, the Court need not address whether he was prejudiced by counsel's performance. *See id*. at 694.

### C. Voir Dire of Juror

Next, Steele argues that his trial attorney was constitutionally ineffective because counsel failed to request a voir dire of juror Thomas Cha regarding his relationship with John DeLeon, the attorney for Maria Garza. "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *see also Murphy v. Florida,* 421 U.S. 794, 799, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). The relevant inquiry whether a juror is properly empaneled is if they can "conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case." *Lockhart v. McCree,* 476 U.S. 162, 184, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986).

At trial, Thomas Cha sent a note to the Court stating: "I know Ms. Garza's attorney, Mr. John De Leon. We met late last year at a seminar. We are not close friends. However, I am

---

[1] Presumably, Steele is referring to the 2001 taped conversations concerning the exchange of money for dropping Aguirre's Michigan criminal charges. Steele does not specify, however, which particular conversations are relevant to his argument.

supposed to call him later or to [sic] have lunch with him and introduce an attorney to John DeLeon." (Tr. at 226-27.) After the Court read Cha's letter to counsel, the Court proposed that it would ask Cha if he could still be fair in light of this information. (*Id.* at 227.) Steele's attorney stated that he did not have a problem with Cha's ability as a juror and did not want to intimidate him or make him feel as if he did something wrong. (*Id.*) Hill then suggested that the Court instruct Cha not to interact with DeLeon until after trial. (*Id.* at 227-28.) The Government agreed and further offered that it was not going to call DeLeon as a witness. (*Id*. at 228.) After Cha entered the courtroom, the Court stated the following: "Thank you, first of all, for submitting this note to the Court. That was absolutely the right thing to do, just to let the Court know. There is not any issue. I have read your note to both counsel, that you know Mr. DeLeon. The only thing I would admonish you [about] is please do not contact him or schedule any kind of lunch until after a verdict is reached in this case, okay?" (*Id.* at 228-29.) Cha answered "okay." (*Id.* at 229.)

Hill's request to have the Court ask Cha not to contact DeLeon was a reasonable, tactical trial strategy because Hill did not want Cha to feel intimidated or that he had done something wrong for knowing Garza's attorney. *See Cage v. McCaughtry,* 305 F.3d 625, 626-27 (7th Cir. 2002). In fact, Hill stated on the record that he thought Cha had candor and was an upright juror. *Id*. ("lawyer might feel that on balance the juror was more likely to vote for than against his client"). As the *Strickland* decision instructs a "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland,* 466 U.S. at 689. Steele has not overcome

14

this presumption, and thus has not establish that his attorney's performance "fell below an objective standard of reasonableness." *Id*. at 688. Because Steele has not established the *Strickland* performance prong, the Court need not address whether counsel's performance prejudiced him. *See id.* at 694.

### D. Failure to Request Competency Examination

Finally, Steele asserts that despite his limited ability to read and write, his dyslexia, and his limited mental capacity, his counsel failed to request a competency hearing before trial. An evidentiary hearing concerning a defendant's competence to stand trial is required when there is "reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." *United States v. Grimes,* 173 F.3d 634, 635-36 (7th Cir. 1999) (quoting 18 U.S.C. § 4241(a)). The test for a defendant's competency to stand trial is "whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960); *Woods v. McBride,* 430 F.3d 813, 817 (7th Cir. 2005). If a court decides that a criminal defendant is incompetent to stand trial, "the court shall commit the defendant to the custody of the Attorney General" and the "Attorney General shall hospitalize the defendant for treatment in a suitable facility" until defendant attains the capacity to proceed to trial. *See* 18 U.S.C. § 4241(d); *see also United States v. Lapi,* 458 F.3d 555, 557 (7th Cir. 2006). A defendant is presumed to be competent to stand trial and bears the burden of proving otherwise. *United States v. Morgano,* 39 F.3d 1358, 1373 (7th Cir. 1994).

15

It is not clear whether Steele believes he was unfit to stand trial or if he just wanted a determination of his limited mental capacity. Nevertheless, assuming that Section 4241 is applicable to Steele's argument, he does not point to any evidence in the record concerning the nature of his "limited mental capacity" or how his trial attorney was aware of this limited mental capacity. Further, the Court had the opportunity to observe Steele's behavior at trial where he appeared to understand the proceedings and assisted his attorney in his defense. *See Dusky*, 362 U.S. at 402; *Grimes,* 173 F.3d at 636.

In light of these circumstances, counsel's failure to move the Court for a competency hearing under 18 U.S.C. § 4241 was not outside the wide range of professionally competent assistance as required under *Strickland*. Because Steele has not established the performance prong under *Strickland,* the Court need not address whether counsel's performance prejudiced him. *See id*. at 694. Accordingly, Steele's ineffective assistance of counsel claims fail.

## CONCLUSION

For these reasons, the Court denies Steele's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.

Dated:   October 31, 2006

                                          **ENTERED**

                                          _____
                                          **AMY J. ST. EVE**
                                          **United States District Court Judge**